USDC SCAN INDEX SHEET











TELEDYNE INDUSTRIES

BOEING COMPANY

LMH    12/10/97    13:17
3:97-CV-02185
*1*
*CMP.*

Case 3:97-cv-02185-E-LSP   Document 1   Filed 12/05/97   PageID.2   Page 2 of 17

LATHAM & WATKINS
    Peter H. Benzian, SBN 047456
    Katherine A. Lauer, SBN 138010
701 "B" Street, Suite 2100
San Diego, California 92101-8197
(619) 236-1234

LATHAM & WATKINS
    Thomas L. Patten, Esq.
1001 Pennsylvania Avenue, N.W., Suite 1300
Washington, D. C. 20005-2505
(202) 637-2200

Attorneys for Plaintiff
Teledyne Industries, Inc.

FILED
DEC - 5 1997
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

TELEDYNE INDUSTRIES, INC., a California corporation,

    Plaintiff,

v.

THE BOEING COMPANY, a Delaware corporation; and McDONNELL DOUGLAS HELICOPTER COMPANY, a Delaware corporation,

    Defendants.

Civil Action No. '97 CV 2185 H (LSP)

COMPLAINT FOR BREACH OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

JURY TRIAL DEMANDED

    Plaintiff Teledyne Industries, Inc., ("Teledyne") brings this action for injunctive relief and damages against The Boeing Company ("Boeing") and McDonnell Douglas Helicopter Company ("MDHC") (collectively "defendants") and alleges as follows:

## INTRODUCTION

    1.    This dispute arises out of MDHC's breach of its contractual relationship to Teledyne in order to obtain for itself or for its affiliate, Boeing, profits on sales of attack helicopter parts to which Teledyne is contractually entitled. Specifically, MDHC has breached a Teaming Agreement and related subsequent

SD_DOCS\71750.1

agreements (all of which are referred to collectively as the "Teaming Agreement") for the sale and purchase of airframes for Apache attack helicopters. The Teaming Agreement has governed the commercial relationship between MDHC and its predecessors, on the one hand, and Teledyne, on the other hand, for nearly 25 years. Defendants' conduct has injured and will cause Teledyne to suffer injury, including the loss of jobs, loss of good will, and loss of revenues of such magnitude that they will threaten the existence of a whole operating division of Teledyne, and other injuries that are not fully or adequately compensable by an award of monetary damages.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that there is diversity of citizenship among the parties and the matter in controversy exceeds $75,000, exclusive of interest and costs.

3. Venue is properly laid in this district pursuant to 28 U.S.C. § 1391(b) and (c).

## THE PARTIES

4. Teledyne is a California corporation whose principal place of business is in Los Angeles, California. Teledyne Ryan Aeronautical ("TRA") is an unincorporated operating division of Teledyne whose principal place of business is in San Diego, California.

5. Boeing is a Delaware corporation with its principal place of business in Seattle, Washington.

6. MDHC is a Delaware corporation with its principal place of business in Mesa, Arizona. MDHC is a wholly owned subsidiary of defendant Boeing. MDHC is the same corporation as, or the successor in interest to, Hughes Helicopters, Inc., whose name has been changed to MDHC. Hughes Helicopters, Inc. is the successor in interest to Hughes Helicopters and Ordinance Division of Summa Corporation.

## FACTUAL BACKGROUND

7. In the early 1970's, the United States Army announced its intention to procure a new type of advanced attack helicopter. During this period, representatives of TRA discussed with representatives of Hughes Helicopters and Ordinance Division of Summa Corporation ("Hughes"), the predecessor-in-interest of MDHC for purposes of this lawsuit, the possibility of entering into a teaming arrangement whereby

LATHAM & WATKINS
ATTORNEYS AT LAW
SAN DIEGO

SD_DOCS\71750.1

2

TRA would become a subcontractor to Hughes in the design, development, manufacture, and sale of advanced attack helicopters of the United States government.

8. These discussions culminated in a Teaming Agreement that was reduced to writing by letter from Barry Shillito, President of TRA, to T.R. Stulpnagel, Vice President and General Manager of Hughes, dated March 13, 1973, and signed by Stulpnagel on April 3, 1973. Pursuant to this agreement, TRA agreed to provide Hughes with design analysis, marketing, support, and engineering support to assist it in obtaining both the prime contract for the design, development, and manufacture of advanced attack helicopter prototypes, *as well as subsequent attack helicopter production contracts*, for what was later denominated as the AH-64 or Apache helicopter. Hughes in turn agreed to purchase from TRA certain major structures of the Apache, including the total fuselage structure, the wing structure, the nacelles, and the empennage (collectively, the "airframe"), under any prototype or production contracts received by Hughes for the Apache helicopter.

9. The Teaming Agreement anticipated that Hughes would enter into a series of prime contracts with the United States government, first for development and later for production of the advanced attack helicopters. The Teaming Agreement required Hughes, in turn, to purchase its requirements for the airframe components from TRA. The Teaming Agreement provides that TRA is contractually entitled to subcontracts for production of all components of the airframes for any Apache helicopters produced by Hughes. Paragraph 2 of the agreement states:

> In the event that you [Hughes] are awarded a production contract <u>or contracts</u> from the United States Government as a result of winning this competition, we [i.e., Hughes and TRA] will negotiate a mutually acceptable subcontract for the items as listed in Paragraph 1, above, for the vehicles to be produced thereunder.

The parties' intent was to ensure that they were bound by the Teaming Agreement through the entire production of Apache helicopters. This intent to award all subcontracts for production of Apache airframes to TRA has been reiterated and confirmed by Hughes and its successors, as set forth in detail below.

10. In 1973 Hughes was successful in obtaining a prime contract for development of the advanced attack helicopter, denominated the AH-64. Hughes and TRA entered into a subcontract whereby Hughes

LATHAM & WATKINS
ATTORNEYS AT LAW
SAN DIEGO

SD_DOCS\71750.1

3

would purchase from TRA advanced attack helicopter airframes. All work by TRA under this subcontract was to be performed in San Diego, California. This subcontract was completed in September of 1976.

11. Hughes subsequently obtained a prime contract from the United States Government for additional development units. Hughes issued another subcontract whereby Hughes would purchase from TRA additional advanced attack helicopter airframes. All work by TRA under this subcontract was to be performed in San Diego, California. This subcontract was completed in May of 1982.

12. Under pressure from Hughes to minimize costs in order to keep the AH-64 program viable, and in light of the Teaming Agreement, TRA performed substantial tasks under the subcontracts referred to in paragraphs 10 and 11 above without profit.

13. Over the next several years, TRA expended considerable additional effort and made significant additional investments (including TRA-financed capital acquisitions), which were not reimbursed by Hughes, in TRA's effort to support early developmental phases of the Apache program. TRA estimates that its unreimbursed expenses were approximately $50 million by 1980. These losses, and subsequent losses sustained by TRA during the Apache program, were incurred in support of the program and in reasonable anticipation that subsequent production contracts would allow TRA to realize sufficient profit such that TRA's participation throughout the life of the program would result in a reasonable profit. This fact was known to Hughes and its successors.

14. In 1980, the Army informed Hughes that it would be awarded the first Apache production contract. Contrary to its obligations under the Teaming Agreement, in August 1980, Hughes informed TRA that it intended to seek competitive bids for the Apache airframes for Production Lot 1 and subsequent production quantities. By letter dated August 19, 1980, TRA reminded Hughes of its obligations under the Teaming Agreement and emphasized the significant financial sacrifices that it had made to support the Apache program. TRA also stressed that it had supported the Apache program from marketing and political perspectives in reliance on Hughes' commitment to purchase all future requirements for airframes from TRA. In particular, TRA had made significant investments to support Hughes' developmental efforts for the Apache. Following further discussions regarding TRA's entitlement to all Apache airframe subcontracts, Hughes subsequently honored its obligations under the Teaming Agreement

and executed a subcontract with TRA for Production Lots 1 and 2, which consisted of eleven and forty-eight Apache airframes, respectively, plus associated production tooling.

15. On January 14, 1983, TRA and Hughes reaffirmed the intent of Teaming Agreement by executing a Memorandum of Agreement ("MOA") which stated in part:

> [Hughes] agrees that: TRA is the subcontractor for at least 515 s/s [sic: shipsets] of airframe structures ....
>
> TRA is committed to negotiate competitive prices with [Hughes] for Lot 3 production and subsequent production lots which are acceptable to [Hughes'] customer.

The 515 shipsets referred to in this MOA encompassed all of Hughes' projected Apache sales based on the parties' expectations at the time. Consistent with the teaming arrangement, TRA and Hughes negotiated prices, terms, and conditions for Lot 3.

16. The parties reached an agreement on the prices, terms, and conditions for Lot 4 on November 21, 1984 at San Diego, California. The agreement is contained in a handwritten document signed by A.C. Haggerty for Hughes and Hudson B. Drake for TRA. In that agreement, the parties again reaffirmed the commitment of Hughes contained in the Teaming Agreement that TRA would be the airframe manufacturer for all Apache helicopters produced by Hughes, by stating in part that Hughes agrees that "TRA will be the subcontractor for the presently planned 675 USG Apache buy [subject to the Israeli offset provisions] in the following paragraph III."

17. In or about early 1985, McDonnell Douglas Corporation acquired Hughes and its corporate affiliates. MDHC is the successor-in-interest to Hughes. In March 1985, TRA received from MDHC a request for a proposal for Production Lot 5. By letter dated October 30, 1985, MDHC advised TRA that the Army was unable to authorize funding for Lot 5 production as originally scheduled. As Hughes had done in the past, MDHC emphasized the "team concept" and asked TRA to share in the risk that the then-planned Apache procurement would not be authorized by Congress:

> <u>As a valued team member</u> and to preserve schedule and program continuity we ask that you assume the responsibility for initiating the first 30 days of effort relating to the P-5 production buy for the items as specified, and for the quantities and delivery schedules set forth herein. [MDHC] will recognize such costs back to 1 November 1985, if and when such funding is received from the Army.

(Emphasis added.)

LATHAM & WATKINS
ATTORNEYS AT LAW
SAN DIEGO

SD_DOCS\71750.1

5

18. Responding to MDHC's request in a manner in keeping with its earlier efforts to support the team arrangement, TRA commenced performance without funding, facing the risk that such costs would not be reimbursed in the event that future funding was not received from the Army. MDHC subsequently received funding from the Army.

19. The terms of the hand-written agreement of November 21, 1984 were included in the formal subcontract prepared by MDHC and submitted to TRA in mid-July 1985. As set forth in the formal subcontract HH-40014A, MDHC and TRA agreed:

> In the event MDHC is awarded prime contracts up to and including 675 shipsets of the AH-64, Teledyne will be the subcontractor for 675 shipsets of Airframe structures including fuselage, wings, nacelles, empennage and fairing kits.

20. The 675 shipsets were defined as including 315 shipsets already ordered for Lots I through IV, 144 to be ordered for Lot V, 144 to be ordered for Lot VI, and 72 to be ordered to Lot VII.

21. TRA signed and returned its copy of subcontract HH-40014A on August 1, 1985, and on July 18, 1986 received a signed formal copy back from MDHC.

22. During the summer of 1986, the Apache program was the subject of extensive debate before the congressional Armed Services committees. During these debates the Army repeatedly stated that its total requirement for Apache helicopters was 1206 aircraft. However, due to funding constraints, the Army was faced with termination of the Apache production at 675 aircraft, thus satisfying only 55% of its requirement. Termination of the Apache program in FY88 at 675 aircraft appeared likely at that time, notwithstanding the general agreement of all concerned that the Army needed additional Apaches beyond that number. Also during this period, Congress expressed concerns that, unlike the Air Force and Navy, the Army had not developed a policy of maintaining two production lines for major weapon systems. Because of these concerns, Congress directed the Army to develop a plan addressing the feasibility of establishing a second source for the Apache helicopter. In July 1986, in response to this directive, the Army Apache program manager instructed MDHC to investigate second sourcing of the fuselage.

23. The negotiations between MDHC an TRA for Production Lots 5 through 7 were conducted against this backdrop in the summer of 1986. As a result, in September 1986, when MDHC and TRA executed an agreement on the pricing of the Apache airframes for Lots 5 and 7, the agreement required MDHC to award TRA all the fuselage subcontracts through the currently funded and then-projected life of

the program -- that is, for 675 aircraft. In recognition that the Army might require MDHC to obtain a second source for the fuselage, the agreement permitted MDHC to procure fuselages for aircraft subsequent to shipset 675 from a second source. The Army, however, subsequently concluded that second sourcing the fuselage was not a viable alternative. Thereafter, MDHC and TRA would serve as the sole source for Apache fuselages.

24. On June 23, 1988, MDHC and TRA executed an Memorandum of Agreement ("MOA") in which they agreed to pricing for production of the airframes for Lots 7+ and 8. The MOA states in part:

> The above price settlement assumes continuous production at a rate of at least 6 [airframes] per month in lot 7/8 and continued follow on production of lot 9. If either of the above change for any reason MDHC/TRA agree to negotiate mutually acceptable price impact in accordance with Federal Acquisition Regulation.

25. Prior to the production on Lots 7+ and 8, TRA had not made any profits, and indeed had suffered severe financial losses on its investments in and work on the Apache program. TRA was willing to incur these losses, which ran into the tens of millions of dollars, in order to maintain its business base as the manufacturer of Apache airframes and based on Hughes' and MDHC's pre-existing commitments that TRA would maintain the airframe work share throughout the life of the Apache system.

26. MDHC and TRA again committed to writing their shared intent regarding future production of the Apache airframe in an August 24, 1988 agreement. This agreement reaffirmed the commitments and obligations contained in the Teaming Agreement and subsequent agreements, and provided in part:

> The parties agree that it is their intent to continue the Apache Team concept with TRA as the selected source for the current Apache Air-Frame for whatever quantities the U.S. Government orders from MDHC through Lot 12, unless the U.S. Government directs otherwise.

At the time, Lot 12 was the last projected Production Lot.

27. On December 16, 1988, in an Addendum to the MOA dated June 23, 1988, MDHC again reiterated its intent to honor the teaming arrangement. This Addendum contained the August 24, 1988 agreement expressing the parties' mutual intent to continue the team concept through Lot 12, which was still the last projected production lot.

28. The parties reaffirmed TRA's right to a specific Apache workshare (including the Longbow configuration) on September 17, 1990, when TRA and MDHC executed a handwritten agreement in which they agreed to pricing for Production Lots 8 and 9. Paragraph 6 of the MOA specifically provided:

TRA [is] to be the supplier or recipient of reasonable licensing revenue for current TRA workshare for Apache <u>including the Longbow configuration</u>; TRA agrees to propose fair and reasonable prices.

29. On February 3, 1993, MDHC informed TRA that it was considering bringing in-house some of the Apache components that are part of TRA's workshare. MDHC subsequently requested a rough order of magnitude ("ROM") proposal addressing the costs associated with terminating TRA's efforts in the composite/fairing area. On March 5, 1993, TRA responded by pointing out to MDHC that the subject components were part of TRA's contractually-mandated workshare and any action by MDHC to bring the work in-house would constitute a breach of contract. In response, on April 8, 1993, MDHC directed TRA to stop work on all of the identified work and requested a firm fixed-price proposal addressing the termination costs. As a result of these and related communications and as a commercial accommodation to MDHC, TRA permitted MDHC to take in-house certain so-called "secondary" structural airframe work (<u>i.e.</u>, work involving composite materials) related to the Apache program.

30. In anticipation of continuing the team arrangement, the parties thereafter began concurrent negotiation of two separate agreements: (1) an agreement known as the AH-64 Apache Production Subcontract Overriding Agreement (the "Overriding Agreement"), which was intended to set forth the terms and conditions that were to be incorporated into all current and subsequent Apache purchase orders between MDHC and TRA; and (2) a Subcontracting Agreement, which was intended effectively to replace the Teaming Agreement, and which was intended to form the basis for the parties' future commercial relationship.

31. The Overriding Agreement was executed on November 15, 1994 by MDHC and TRA. MDHC and TRA could not, however, agree to certain terms of the Subcontracting Agreement. In particular, MDHC insisted that the Subcontracting Agreement give it the right to purchase Apache airframes from a source other than TRA without a payment of royalties to TRA. Because this would have provided TRA fewer rights than it held under the Teaming Agreement, TRA refused to agree to such a provision. The parties did not execute a Subcontracting Agreement and their commercial relationship continued to be governed by the Teaming Agreement.

LATHAM & WATKINS
ATTORNEYS AT LAW
SAN DIEGO

SD_DOCS\71750.1

8

32. In or about late 1995, MDHC anticipated entering into contracts for the sale of Apache helicopters to the governments of the Netherlands and the United Kingdom. In order to begin the production process for those anticipated contracts, MDHC approached TRA and initiated discussions about interim production funding for the airframes, pending the execution of definitized subcontracts between MDHC and TRA for these airframes.

33. In or about January 1996, TRA began to produce and manufacture additional airframes for the Apache program pursuant to Not To Exceed Purchase Order 598697 issued by MDHC, which subsequently was revised on several occasions. This purchase order was to supply airframes for the Longbow configuration of the Apache helicopters that were to be sold by MDHC to the government of the Netherlands (the "Netherlands PO"). The Netherlands PO calls for TRA to manufacture 30 shipsets of Apache airframes.

34. In or about June 1996, TRA began to produce and manufacture additional airframes for the Apache program pursuant to Not To Exceed Purchase Order 609182 issued by MDHC, which subsequently was revised on several occasions. This purchase order was to supply airframes for the Longbow configuration of the Apache helicopters that were to be sold by MDHC to the government of the United Kingdom (the "UK PO"). The UK PO calls for TRA to manufacture 67 shipsets of Apache airframes.

35. The 97 shipsets of airframes that are to be produced pursuant to the UK and Netherlands POs collectively are referred to as Lot 14 or Production Lot 14.

36. In or about August 1997, Boeing merged with and/or became the successor in interest to MDHC's corporate parent, McDonnell Douglas Aerospace. Teledyne is informed and believes that MDHC became at that time a wholly-owned subsidiary, either directly or indirectly, of Boeing. Teledyne is further informed and believes that Boeing and MDHC discussed and contemplated that, after completion of the merger, MDHC would breach the Teaming Agreement with TRA, in order that Boeing would be able to pull all of the Apache airframe work out of TRA and move it to Boeing's helicopter production facility in Philadelphia, Pennsylvania, known as the Vertol facility.

37. Shortly after the consummation of the merger, in September 1997, Mr. Dean Borgman, the President of Boeing's Mesa, Arizona Apache production facility, advised TRA's President, Mr. Robert

Mitchell, that Boeing intended to pull all of the Apache airframe work out of TRA and move it to Boeing's Vertol helicopter production facility. Other Boeing representatives also communicated this intent to other TRA employees around that time. In conjunction with these statements, Boeing requested that it be permitted to visit TRA's Apache airframe production facility to review the airframe tooling in anticipation of its relocation to the Vertol facility.

38. This threatened breach of the Teaming Agreement was again communicated to TRA in a meeting held at Boeing's Mesa, Arizona facility on November 10, 1997. During that meeting Borgman advised Mitchell that Boeing did not intend to enter into a firm, definitized subcontract for Lot 14, and again advised Mitchell that Boeing instead intended to transfer future production of the Apache airframes to the Boeing Vertol facility. In a subsequent telephone conference between Borgman and Mitchell on November 17, 1997, Borgman reiterated Boeing's intent not to negotiate a contract for Lot 14.

39. On November 21, 1997, when Borgman again reiterated Boeing's intent to move future Apache airframe production to the Vertol facility, Mitchell stated to Borgman that Boeing never intended to enter into a definitized subcontract for Lot 14. Borgman did not contest this statement.

40. By letter dated November 21, 1997, Boeing issued a notice of partial termination for convenience to TRA with respect to work being performed under the Netherlands and UK POs. Boeing's purpose in issuing the partial termination letter was clear -- namely to begin the process of the withdrawal of the Apache airframe work from TRA to the Boeing Vertol facility. Subparagraph b of the notice of partial termination provides:

> Prepare to transfer to The Boeing Company - Philadelphia all unperformed or partially performed subcontracts and purchase orders related to the terminated portions of the Reference (B) and (C) Letter Authorizations. Prepare to transfer all raw materials, parts and tooling to The Boeing Company - Philadelphia in accordance with direction from The Boeing Company - Mesa.

Subparagraph f provides:

> Proceed as promptly as possible to obtain from your subcontractors and vendors settlement proposals, with supporting schedules, with respect to any subcontracts and purchase orders not transferred to Boeing Philadelphia, and settle the same or obtain signed release where no claims are to be presented.

The notice further states that "[a] Boeing transition team will be in your facility the first week of December to formulate a transition plan."

LATHAM & WATKINS
ATTORNEYS AT LAW
SAN DIEGO

SD_DOCS\71750.1

10

41. Boeing's November 21, 1997 notice of partial termination and Boeing's stated intent to withdraw the Apache airframe work from TRA and to place it with Boeing's Vertol facility constitute a breach of the Teaming Agreement.

42. Boeing, through its subsidiary MDHC, is the only manufacturer of the Apache helicopter. TRA's loss of the Apache airframe workshare will result in TRA having substantial idle production capacity for which there is no viable alternative use.

43. Boeing's November 21, 1997 notice of partial termination and its long-term scheme to withdraw all of TRA's workshare on the Apache airframes, if allowed to succeed, will cause TRA to begin to lose work on the Apache airframes as early as mid-1998, which losses will continue and incrementally increase through the second half of calendar year 1998, culminating in the complete loss of the Apache work by the beginning of calendar year 1999.

44. Defendants failure to comply with the Teaming Agreement will cause irreperable injury to TRA's operations, including, without limitation, lost revenue, employee dislocation, an underutilized facility, and inability to restart work on Apache airframes once stopped. TRA's loss of the Apache airframe work threatens TRA's existence as a viable operating division of Teledyne.

45. These injuries cannot be adequately compensated by monetary damages alone.

## COUNT I

### (Breach of Contract)

46. Teledyne incorporates by reference the allegations of the preceding paragraphs as if set forth in full herein.

47. Defendants' above-described conduct constitutes a breach of the Teaming Agreement.

48. All conditions precedent to TRA's performance under the Teaming Agreement have been satisfied, or have been waived or excused by MDHC, and TRA is and continues to be ready, willing and able to continue its performance under the Teaming Agreement..

49. Defendant MDHC breached the Teaming Agreement by refusing to purchase its requirements for the airframes for future AH-64 helicopters from Teledyne, and announcing its intention to produce the airframes itself or through its corporate parent, defendant Boeing.

LATHAM & WATKINS
ATTORNEYS AT LAW
SAN DIEGO

SD_DOCS\71750.1

11

50. Alternatively, defendant MDHC's refusal to purchase the airframes for the AH-64 helicopters from TRA, and its associated announcement of its intention to produce the components itself or through its corporate parent, constituted an anticipatory breach of the Teaming Agreement.

51. Teledyne is entitled to permanent injunctive relief against Boeing and MDHC. Alternatively, Teledyne is entitled to damages, including, but not limited to, its lost profits on the Apache program, lost profits on all other work for which is cannot compete effectively because of its loss of the Apache work, full compensation for all of TRA's investment in the tooling it developed to manufacture the Apache airframe, and overhead expenses. Teledyne's damages exceed $100 million, exclusive of interests and costs.

## COUNT II

### (Breach Of The Implied Covenant Of Good Faith And Fair Dealing)

52. Teledyne incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

53. TRA and defendant MDHC (through its predecessor Hughes) entered into the Teaming Agreement on April 3, 1973, as subsequently confirmed as set forth more fully above.

54. TRA has, at all times, dealt fairly and in good faith with MDHC in respect of its obligations under said contract.

55. By virtue of the joint efforts of the parties to develop, produce, and sell the AH-64 helicopters, and by virtue of the prime contractor-subcontractor relationship, TRA necessarily reposed great trust and confidence in MDHC, and as a result a fiduciary, quasi-fiduciary, or special relationship exists between Teledyne and defendants.

56. Defendant MDHC, in bad faith and without probable cause, has breached the covenant of good faith and fair dealing implied under the Teaming Agreement by denying the existence of its contractual obligations under said contract,

57. As a result of this breach of the implied covenant of good faith and fair dealing, Teledyne has suffered monetary damages in excess of $100 million.

58. Defendant engaged in the above conduct with oppression, fraud, or malice, and Teledyne is therefore entitled to an award of punitive damages.

## COUNT III

### (Tortious Interference With Contractual Relations By Defendant Boeing)

59. Teledyne incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

60. Teledyne and defendant MDHC (through its predecessor Hughes) entered into the Teaming Agreement on April 3, 1973, as subsequently confirmed as more fully set forth above.

61. TRA has, at all times, performed its obligations under the Teaming Agreement.

62. Defendant Boeing, prior to obtaining any ownership interest in MDHC or its affiliated corperators, knew of the existence of the Teaming Agreement, and knew that MDHC was obligated to purchase Apache airframes from TRA pursuant to that agreement. In spite of this knowledge, and with malicious intent to induce MDHC to breach the Teaming Agreement, defendant Boeing induced MDHC to breach the Teaming Agreement without just cause and to deny to Teledyne its rights and interests thereunder.

63. As a result of such inducement by defendant Boeing, defendant MDHC breached the Teaming Agreement, thereby causing Teledyne to suffer monetary damages in excess of $100 million.

64. Defendants engaged in the above conduct with oppression, fraud, or malice, and Teledyne is therefore entitled to an award of punitive damages.

## RELIEF REQUESTED

65. Teledyne requests that defendants, their directors, officers, agents, successors, and assigns and all other acting on its behalf, be permanently enjoined, as a result of their wrongful activities, from:

(a) engaging in any further attempts to withdraw the airframe work for the Apache helicopter program from TRA and any further attempts to obtain that work for themselves, any affiliated entity, or any third party; and

(b) failing to deal in good faith with TRA with respect to all future airframe work for the Apache helicopter program and failing to negotiate in good faith and enter into subcontracts with TRA for all such future work for which defendants have received or will receive a prime contract from any customer.

LATHAM & WATKINS
ATTORNEYS AT LAW
SAN DIEGO

SD_DOCS\71750.1

13

66. Teledyne requests that MDHC be ordered to specifically perform all of its obligations under the Teaming Agreement, including without limitation that defendants be ordered to:

    (a) cease any attempt to remove the Apache airframe tooling from any TRA facility and relocating it to any facility owned or used by Boeing or any other person or entity;

    (b) make no further attempts to withdraw the airframe work for the Apache helicopter program from TRA and make no further attempts to obtain that work for themselves, any affiliated entity, or any third party; and

    (c) deal in good faith with TRA with respect to all future airframe work for the Apache helicopter program and negotiate in good faith and enter into subcontracts with TRA for all such future work for which defendants have received or will receive a prime contract from any customer.

67. Teledyne requests that defendants be ordered to pay Teledyne all damages sustained by it, together with reasonable attorneys' fees and costs of this action, and enter judgment against defendants for that amount.

68. Teledyne requests that the Court grant such other relief as it shall deem just and appropriate.

### JURY DEMAND

Teledyne demands trial by jury on all issues of fact herein.

Dated: December 5, 1997

LATHAM & WATKINS

By _____
Katherine A. Lauer
Attorneys for Plaintiff
Teledyne Industries, Inc.

SD_DOCS\71750.1

14

# United States District Court

| SOUTHERN | DISTRICT OF | CALIFORNIA |
|---|---|---|

TELEDYNE INDUSTRIES, INC.,
a California corporation

V.

THE BOEING COMPANY, a Delaware
corporation; and McDONNELL DOUGLAS
HELICOPTER COMPANY, a Delaware
corporation

**SUMMONS IN A CIVIL ACTION**

CASE NUMBER: 97 CV 2185 H (LSP)

TO: (Name and Address of Defendant)

The Boeing Company
7755 East Marginal Way South
Seattle, Washington

McDonnell Douglas Helicopter Company
5000 East McDowell Road
Mesa, Arizona  85215-9797

**YOU ARE HEREBY SUMMONED** and required to file with the Clerk of this Court and serve upon

**PLAINTIFF'S ATTORNEY** (name and address)

Peter H. Benzian, Esq.
Katherine A. Lauer, Esq.
LATHAM & WATKINS
701 "B" Street, Suite 2100
San Diego, CA  92101

Thomas L. Patten, Esq.
LATHAM & WATKINS
1001 Pennsylvania Ave., N.W.
Suite 1300
Washington, D.C.  20005-2505

an answer to the complaint which is herewith served upon you, within ___TWENTY (20)___ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

ROBERTA WESTDAL
CLERK

R. K. MESSIG

DATE  12-5-97

AO-440S

JS 44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I (a) PLAINTIFFS

TELEDYNE INDUSTRIES, INC.

## DEFENDANTS

THE BOEING COMPANY, McDONNELL DOUGLAS HELICOPTER COMPANY

FILED
DEC - 5 1997
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  Seattle
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Katherine A. Lauer      (619) 236-1234
Latham & Watkins
701 "B" Street, Suite 2100
San Diego, CA  92101

ATTORNEYS (IF KNOWN)

97CV2185 H (LSP)

## II. BASIS OF JURISDICTION  (PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES  (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION  (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

28 U.S.C. Section 1332

## V. NATURE OF SUIT  (PLACE AN x IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— Med Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury— Product Liability | ☐ 630 Liquor Laws | PROPERTY RIGHTS | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | | | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | PERSONAL PROPERTY | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | LABOR | SOCIAL SECURITY | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Habeas Corpus: | ☐ 790 Other Labor Litigation | FEDERAL TAX SUITS | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 240 Torts to Land | | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 550 Other | | | ☐ 890 Other Statutory Actions |

## VI. ORIGIN  (PLACE AN x IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A CLASS ACTION
☐ UNDER F.R.C.P. 23

DEMAND $ $100 million

Check YES only if demanded in complaint:
JURY DEMAND:   ☒ YES   ☐ NO

## VIII. RELATED CASE(S) IF ANY  (See instructions):

JUDGE _____   DOCKET NUMBER _____

12/8/97
DATE

SIGNATURE OF ATTORNEY OF RECORD

UNITED STATES DISTRICT COURT     #34965